No. 26-2084

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

MASSACHUSETTS FAIR HOUSING CENTER et al.,
Plaintiffs-Appellees,
*v.*
U.S DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
et al.,
Defendants-Appellants,

On Appeal from the United States District Court
for the District of Massachusetts
Case No. 3:26-cv-30117-MJJ

**PLAINTIFFS-APPELLEES' BRIEF IN OPPOSITION TO DEFENDANTS-APPELLANTS' MOTION FOR STAY PENDING APPEAL**


Lila Miller (Bar No. 1216671)
Reed Colfax (Bar No.1216672)
Nicholas Abbott (Bar No. 1226475)
RELMAN COLFAX PLLC
1225 19th Street NW Suite 600
Washington, DC 20036
Telephone: (202) 728-1888
Facsimile: (202) 728-0848
lmiller@relmanlaw.com
rcolfax@relmanlaw.com
nabbott@relmanlaw.com


October 2, 2026

*Counsel for Plaintiffs-Appellees*

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ iii

INTRODUCTION ...................................................................................1

FACTUAL BACKGROUND ........................................................................4

I. The Fair Housing Initiatives Program ........................................................4

II. Defendants' Issuance of Arbitrary and Capricious FY2025 NOFOs .........6

III. Plaintiffs' and NFHA Members' Reliance on HUD's Consistent Administration of FHIP ...........................................................................9

IV. Proceedings in the District Court ...............................................................9

LEGAL STANDARD ................................................................................11

ARGUMENT ..........................................................................................12

I. Defendants Are Not Likely to Succeed on the Merits of Their Appeal. ..12

A. The FY2025 NOFOs Are Judicially Reviewable. ...........................12

B. The FY2025 NOFOs are Arbitrary and Capricious. .......................13

II. The District Court Appropriately Ordered Interim Relief. .......................18

III. Defendants Will Not Be Irreparably Injured Absent a Stay. ....................21

IV. The Remaining Nken Factors Weigh Against a Stay ...............................23

CONCLUSION .......................................................................................23

CERTIFICATE OF COMPLIANCE ...........................................................25

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(c), Plaintiffs-Appellees Massachusetts Fair Housing Center and National Fair Housing Alliance state that they are non-profit corporations with no parent corporations and that no public company owns any interest in them.

*s/ Lila Miller*
Lila Miller
*Counsel for Plaintiffs-Appellants*

## INTRODUCTION

The stakes of Defendants' Motion to Stay are high, but not for the reasons offered by Defendants. If a stay is granted, Defendants will quickly distribute tens of millions of dollars in federal funding that Congress intended for the existing network of fair housing organizations to a few entities with little to no experience in fair housing enforcement. Such a result would effectively grant Defendants final relief in their favor in this appeal and the underlying case because the monies at issue would be distributed pursuant to Defendant's plan. As the district court correctly found, this would deliver a severe and permanent blow to the network of fair housing organizations that does most of the work of enforcing the Fair Housing Act ("FHA") on the ground in communities around the country, including Plaintiffs the Massachusetts Fair Housing Center and the National Fair Housing Alliance. By contrast, if the district court's interim relief is left intact, the status quo will prevail and this irreparable and devastating outcome can be avoided while this Court considers Defendants' appeal.

Congress established the Fair Housing Initiatives Program ("FHIP") nearly forty years ago to fund fair housing organizations with missions to prevent and remedy housing discrimination. The program has been effective, and it is widely accepted that FHIP-funded organizations are vital to fair housing enforcement and

education. With access to the network of over 100 fair housing organizations throughout the country, victims of housing discrimination have had important advocates to ensure their rights are protected, and thousands of housing providers have been trained, counseled, and required to comply with fair housing laws. Each year, the network makes equal housing opportunity a reality for tens of thousands of home seekers who would otherwise have been discriminatorily denied the homes of their choice.

Since February 2025, the Department of Housing and Urban Development ("HUD") has been attempting to roll back fair housing enforcement in general and the FHIP program in particular. HUD launched its current effort to dismantle FHIP, the agency's third direct assault on the program, on July 2, 2026 through Notices of Funding Opportunity ("NOFOs") for fiscal year 2025 ("FY2025") funds. The NOFOs diverted FHIP funds from their intended recipients—the network of fair housing organizations ensuring equal access to housing—to a few large entities, whose primary qualification appears to be a willingness to swear allegiance to the Administration's political goals. In particular, the NOFOs dramatically restructure the number, size, and category of FHIP awards, entirely eliminating what had been the core fair housing grants. The NOFOs also impose restrictive eligibility criteria; subjective and amorphous review criteria; and award conditions that are wholly

unrelated to fair housing. Taking these facets together, the NOFOs are a transparent attempt to torpedo a decades-old FHIP-funded fair housing network that has effectively stood up to housing discrimination.

As the district court found, HUD has offered no reasonable explanation for its overhaul of FHIP. Nor did HUD consider the reliance interests of fair housing organizations, like Plaintiffs and the communities they serve. Plaintiffs are likely to prevail on their claims that the FY2025 NOFOs are arbitrary and capricious and contrary to law.

In addition to acknowledging Plaintiffs' likelihood of success, the district court rightly recognized that HUD's attempt to unilaterally restructure FHIP would decimate the fair housing organization network. The district court ordered preliminary relief to preserve the status quo and mitigate Plaintiffs' injuries while the litigation proceeds.

To be clear: HUD has not been ordered to obligate FY2025 FHIP funds by a certain date or to specific recipients. Rather, the agency must take interim steps toward lawful NOFOs and awards. If Plaintiffs prevail, these interim steps will facilitate swift action upon entry of judgment. If Defendants prevail, then HUD remains able to proceed with its original July 2 NOFOs. The district courts' orders thus maintain the status quo (in which HUD can move quickly to make awards one

way or the other at the end of the case) while this Court considers HUD's appeal. On the other hand, staying the district court's orders would effectively decide this entire case in HUD's favor by allowing it to immediately make awards pursuant to the challenged NOFOs. The Court should therefore deny Defendants' request for a stay pending appeal.

## FACTUAL BACKGROUND

### I. The Fair Housing Initiatives Program.

Congress amended the FHA to permanently establish FHIP in 1992, and FHIP has subsequently been the country's central mechanism for the prevention and remediation of housing discrimination. In so doing, Congress recognized "the proven efficacy of" fair housing organizations as "a necessary component of the fair housing enforcement system," Pub. L. No. 102-550, § 905(a)(9), 106 Stat. 3869 (Oct. 28, 1992), and codified FHIP as sustainable support for these organizations.

The FHA specifies FHIP initiatives and activities. FHIP's chief focus is fair housing enforcement, and the first type of grant enumerated in the statute is the **Private Enforcement Initiative ("PEI")**. PEI grants encompass "a range of investigative and enforcement activities designed to" investigate housing discrimination, "discover and remedy discrimination in public and private real

estate markets and real estate-related transactions," and develop models "to respond to new or sophisticated forms of discrimination." 42 U.S.C. § 3616a(b)(2). The FHA also enumerates the **Education and Outreach Initiative ("EOI")**, which serves the core FHIP purpose of educating the general public about fair housing rights and responsibilities, *id.* § 3616a(d), and the **Fair Housing Organization Initiative ("FHOI")**, *id.* § 3616a(c), which builds organizational capacity and can be used to start new fair housing organizations. The FHA requires that HUD "shall" use FHIP funds for each of these purposes. *Id.* § 3616a(b)–(d).

The FHA also defines the primary recipients of FHIP awards: qualified fair housing organizations (which must have at least two years of experience with enforcement activities like those funded by PEI awards and be engaged in such work at the time of the application) and fair housing organizations (which, at the time of the application, must have at least one year of experience with and be currently engaged in the kinds of work funded by PEI awards). *Id.* § 3616a(h)(1)–(2). Congress also expressly contemplated use of FHIP funds to fund many organizations nationwide. The FHA instructs HUD to make FHOI awards in "those areas of the country which are currently underserved by fair housing enforcement organizations" and to evaluate the "national need" for fair housing capacity with FHOI grants. *Id.* § 3616a(c)(2). The statute also mandates both a "national"

education and outreach program and "education and outreach programs at the regional and local levels", *id.* § 3616a(d)(1)–(2), and requires the Secretary to submit an annual report to Congress regarding implementation of FHIP, which is to include "a list of all fair housing enforcement organizations funded under this section during the preceding fiscal year, identified on a state-by-state basis." *Id.* § 3616a(j)(3).

Since FHIP's inception, HUD has deployed FHIP funds each year to PEI, EOI, and FHOI, with the majority of funds going to PEI awards. ECF 16 at 5[1]. Consistent with Congress's stated goal of expanding fair housing enforcement "nationwide," S. Rep. No.102-332 at 98 (1992), those funds have seeded the development of a reliable and geographically diverse network of fair housing organizations, throughout ten HUD-defined regions of the country. ECF 16 at 4.

## II. Defendants' Issuance of Arbitrary and Capricious FY2025 NOFOs.

For FY2025 FHIP funds, HUD originally signaled its intention to administer FHIP in a manner consistent with these historic practices. In its FY2025 Congressional Budget Justification (CBJ), HUD proposed allocating $56 million in requested FHIP funding across all three initiatives, including $42.3 million for PEI

[1] ECF citations refer to the filings on the district court docket. "Add." citations refer to the Addendum filed with Defendants' Motion for Stay.

grants, $2.7 million for FHOI grants, and $10 million for EOI grants. ECF 16 at 6. After the requested funds were appropriated, HUD, in early 2026, posted Assistance Listings contemplating approximately $41.6 million in PEI awards, $4.4 million in FHOI awards, and $9.5 million in EOI awards. *Id.*

On July 2, 2026, HUD released two FY2025 NOFOs: an FHOI NOFO and an Administrative Enforcement Initiative ("AEI") NOFO (collectively the "FY2025 NOFOs"). The award structure set forth in those NOFOs is a dramatic departure from HUD's past practice, from the proposed allocation in the CBJ, and from the still-posted Assistance Listings. Breaking a heretofore unbroken historic practice, there will be no new PEI or EOI grants. Instead, HUD is directing $45 million of the FY2025 FHIP appropriation toward just five FHOI grants, ranging from $5,025,000 to $25,000,000, ECF 16-5, and $10 million in the AEI NOFO—for an initiative that is not in the statute and has not received FHIP dollars since 1995, *see* ECF 16-3 ¶ 7—which directs that money toward governmental agencies that typically are separately accounted for by a separate funding source, ECF 16-6 at 7.

The FY2025 NOFOs further transform FHIP by imposing eligibility criteria that exclude nearly all existing nonprofit fair housing organizations. Those organizations are barred from receiving AEI funding because they are not

government agencies. And they are effectively barred from receiving FY2025 FHOI funding. FHOI awards may not provide more than 50% of the operating budget of the recipient for any one year (the "50% Cap"). *See* 42 U.S.C. § 3616a(c)(1) (imposing an operating budget limitation for certain FHOI awards, not PEI or EOI awards). Because the smallest projected FY2025 FHOI award is more than $5 million over two years, ECF 16-3 at 6–7, the 50% Cap means that a recipient must have an annual budget of more than $5 million. Most existing fair housing organizations have budgets of just $400,000 to $2 million, ECF 16-3 ¶ 17, meaning that they are categorically ineligible for FY2025 awards. The NOFO also prohibits recipients from having multiple FHIP awards at the same time, ECF 16-5 at 9, even though organizations routinely receive multiple FHIP awards.

Next, the FHOI NOFO imposes amorphous and arbitrary merit review criteria that require applicants to explain their alignment with the Administration's political priorities unrelated to fair housing. ECF 16-5 at 40–52. And the FY2025 NOFOs impose novel award conditions that are vague, irrelevant to fair housing work, and/or at odds with federal law. *See* ECF 16-5 at 61 (listing eleven executive orders grantees must comply with).

## III. Plaintiffs' and NFHA Members' Reliance on HUD's Consistent Administration of FHIP.

Plaintiffs MFHC and NFHA, along with its members, have long relied on FHIP funding. With FHIP funds comprising a substantial portion of the organizations' budget, they rely on year-to-year FHIP grants to create a stability that allows them to hire permanent employees, attract other funders, and commit to ongoing advocacy for their clients. Without renewed FHIP awards, both Plaintiffs will have to lay off staff, ECF 16-4 ¶ 12; ECF 16-2 ¶ 18, while MFHC faces the prospect of closure. ECF 16-4 ¶ 12. In addition, NFHA represents the interests of its approximately 163 member organizations throughout the country. ECF 16-2 ¶ 4. Most of those organizations rely on FHIP funding to conduct their day-to-day fair housing operations, and many of them could not survive in the absence of FHIP funding. *Id.*

## IV. Proceedings in the District Court.

On July 23, 2026, Plaintiffs filed this lawsuit and a motion for a temporary restraining order against the FY2025 NOFOs. Defendants filed a response—which included a Memorandum for Administrative Record by HUD official Robert Doles (the "Doles Memo")[2]—and the parties presented argument at a hearing on August

[2] HUD has also produced made-for-litigation declarations from Nathan Roth, which the district court correctly disregarded as a post-hoc rationalization. ECF 28

13, 2026. On August 26, 2026, the court issued an order granting Plaintiffs' motion. ECF 28.

The district court held that Plaintiffs were likely to succeed on their claim that the FY2025 NOFOs were arbitrary and capricious in violation of the Administrative Procedure Act ("APA") and found that Plaintiffs would suffer irreparable harm absent immediate relief. ECF 28. Given that harm, and "[g]iven the FY2025 funds [would] expire on September 30, 2026, leaving little time to undertake a full planning process," the court ordered Defendants "to adopt their FY2024 structure in allocating the FY2025 funds." *Id.* at 26.

On September 8, 2026, Defendants moved for reconsideration on the grounds that (1) an intervening continuing resolution ("CR") enacted by Congress would allow unobligated FY2025 funds to remain available after September 30, 2026, and (2) the relief ordered by the court exceeded the scope of relief under the APA. ECF 34. On September 14, 2026, the court largely denied the motion, ECF 39. The court concluded that (1) Plaintiffs' ongoing irreparable harm warranted preliminary relief notwithstanding the CR, and (2) it had equitable authority to order interim relief under the APA. However, it relaxed the requirement that

at 17–18. However, as set forth below, the Roth Declarations do not move the needle even if they are part of the analysis.

Defendants make awards by September 30, in light of the CR. Instead, the court ordered HUD to move expeditiously toward publishing lawful NOFOs and making awards—without setting explicit deadlines—and required Defendants to file regular status reports apprising the court of their progress and their expected timeframe.

## LEGAL STANDARD

"'A stay is an intrusion into the ordinary processes of administration and judicial review.'" *Washington v. HUD*, 171 F.4th 473, 488 (1st Cir. 2026) (quoting *Nken v. Holder*, 556 U.S. 418, 427 (2009)). In seeking a stay, the movant bears the burden of showing that they are "entitled to this 'extraordinary remedy' under *Nken*'s familiar four-factor test." *Id.* (quoting *Nken*, 556 U.S. at 437 (Kennedy, J., concurring)). "A stay is not a matter of right, even if irreparable injury might otherwise result." *Nken*, 556 U.S. at 433 (2009) (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926)).

Under the *Nken* test, Defendants must (1) make "a strong showing" that they are likely to succeed on the merits of its appeal and also show that (2) they "will be irreparably injured absent a stay"; (3) the issuance of the stay will not "substantially injure the other parties interested in the proceeding"; and (4) the public interest weighs in favor of a stay. *Washington*, 171 F.4th at 488 (quoting

*Nken*, 556 U.S. at 434). The first two factors are the "most critical." *Id.* (quoting *Nken*, 556 U.S. at 434). When assessing the fourth factor, courts "consider the interests of the public in general, . . . not just the interest of the parties." *Id.*

## ARGUMENT

### I. Defendants Are Not Likely to Succeed on the Merits of Their Appeal.

#### A. The FY2025 NOFOs Are Judicially Reviewable.

The district court correctly ruled that the APA's "basic presumption of judicial review," *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967), applies to HUD's administration of FHIP, *see* ECF 28 at 12–15. The APA's exception to reviewability is "quite narrow" and restricted to "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019). Courts consistently hold that statutes authorizing HUD's grant administration do not fall within this exception. *See N.A.A.C.P. v. Sec'y of Hous. and Urb. Dev.*, 817 F.2d 149, 157–59 (1st Cir. 1987); *Westchester v. U.S. Dep't of Hous. and Urb. Dev.*, 778 F.3d 412, 418–22 (2d Cir. 2015).

The rare circumstances that except agency action from judicial review do not exist here. The statutory text of the FHA provides meaningful standards that

constrain HUD's use of FHIP funding, including requirements related to the purpose of FHIP, the recipients eligible for FHIP awards, the activities that recipients should undertake with their awards to promote the purposes of the Act, and HUD's reporting obligations. *See generally* 42 U.S.C. § 3616a. These provisions provide ample standards against which to measure whether HUD's structural decisions for FY2025 FHIP funding are unlawful. That HUD has *some* discretion in administering this funding does not mean that *any* choice it makes, no matter how untethered from the statutory purposes or unexplained, is beyond review. *See* ECF 49 at 8 ("I did not hold that [the court] may review every discretionary allocation decision within a lump-sum appropriation merely because a different allocation might better advance FHIP policy. Rather, I concluded that the claims presented implicated legal constraints and reasoned agency decision-making subject to APA review and were not reducible to an abstract disagreement over the agency's preferred distribution of a lump-sum appropriation.").

### B. The FY2025 NOFOs are Arbitrary and Capricious.

The district court correctly held that the FY2025 NOFOs are likely arbitrary and capricious under the APA. 5 U.S.C. § 706(2)(A). An agency's explanation for its action must be "clear enough that its 'path may reasonably be discerned.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (citation omitted). And an

agency "must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account," *Regents*, 591 U.S. at 30 (citations and internal quotations marks omitted). An agency acts arbitrarily and capriciously when it fails "to provide [a] minimal level of analysis," *Encino*, 579 U.S. at 221, and when it ignores reliance interests, *Regents*, 591 U.S. at 30.

Here, the district court correctly determined that Plaintiffs are likely to succeed on the merits for three independent reasons.

***First***, the district court rightly held that HUD has not adequately explained its drastic restructuring of FHIP via the FY2025 NOFOs. HUD was obligated to explain its decision to, for the first time, eliminate PEI and EOI grants (until now the core of the FHIP program) entirely and divert an entire fiscal year's FHIP appropriation away from the fair housing organizations enumerated in the FHA's text. It provided none. Instead, HUD attempted to defend its FY2025 NOFOs by claiming it treated the FY2025 and FY2026 funds as one funding package. Mot. at 14. But, as the district court found, "there is no explanation for the change to a blended two-year structure." ECF 28 at 18. This structure was not addressed in the Doles Memo, *see* Add. 57–61, and the First Roth Declaration merely states that delays from the government shutdown and a congressional deadline for FY2026 NOFOs "affected the FY2025 and FY2026 NOFO package." Add. at 66. But those

assertions are belied by the agency's decision to still offer FY2025 and FY2026 FHIP funds on two distinct timelines, and neither explains why HUD shut fair housing organizations out of all FY2025 FHIP funds, an outcome the agency has not disputed in this litigation. Even now, HUD's Motion makes no effort to *explain* the new "blended" structure or the complete exclusion of fair housing organizations from FY2025 FHIP funds.

Nor has HUD adequately explained the other changes in the FY2025 NOFOs, including the zeroing out of PEI and EOI awards; the channeling of FHIP money to AEI awards; the changed eligibility and merit criteria; and the award conditions. Many of these material deviations break from decades of historic practice, as well as from the specific commitments set forth in HUD's congressional budget justification and assistance listings. To the extent HUD did provide reasoning, it was contradicted by the record. As just one example, HUD claimed to be driven by (unsupported) concerns of waste and abuse, yet its restructuring of FHIP will waste millions of dollars in previous FHIP awards by forcing fair housing organizations to stop their existing FHIP activities midstream—abandoning ongoing projects and investigations—if not close entirely.

HUD's Motion dresses up the same set of insufficient information and sources in new terminology. For example, HUD now claims the agency

"determined it would be most effective" to achieve its goals by "partnering with a smaller number of larger, national organizations," Mot. at 15 (citing portions of the Doles Memo), yet it relies on the same portions of the record that the district court already deemed inadequate, ECF 28 at 18 (finding that "the memorandum does not so much explain as it does claim"). But no amount of rebranding can overcome the glaring inadequacies of the NOFOs, the Doles Memo, and the Roth Declarations.

***Second*****,** the district court correctly held that the FY2025 NOFOs do not account for Plaintiffs' reliance interests. HUD claimed it "considered the potential effect" of its changes, yet this consideration was limited to a conclusory assertion that "the impact would be limited because most current recipients continue to operate under multi-year awards." Add. at 59. HUD's stay motion doubles down on this assertion, again focusing only on organizations with ongoing PEI grants. Mot. at 15. But HUD ignored entirely the fair housing organizations whose multi-year PEI grants have already expired, as well as those organizations that would have sought new EOI grants for fair housing education activities. Organizations in both categories relied on the ability to compete for FY2025 FHIP funds, an impossibility under the FY2025 NOFOs. As the district court found, "there is no indication that Defendants acknowledge[d], let alone consider[ed] what their planned NOFOs will do to Plaintiffs' reliance interests." ECF 28 at 20–21.

***Third*****,** the district court correctly found HUD's reasons for the FY2025 NOFOs pretextual because "the rationale does not square with [the NOFOs'] impact." *Id.* at 21. For example, the Doles Memo claimed that the FY2025 NOFOs "expand geographic coverage . . . broaden and invest in future expertise, increase innovation, and strengthen the long-term resilience of the national fair housing infrastructure." Add. at 59. But the FY2025 NOFOs redirect funds that ordinarily would have gone to over one hundred organizations scattered throughout the country to just five private grantees and three state agencies, a sharp reduction that cannot possibly "expand" FHIP's geographic reach.

HUD's Motion does not even address the district court's finding of pretext, nor did the agency meaningfully respond to this claim in its district court briefing, ECF 28 at 21. Because HUD must make a strong showing that all three of the district court's independent conclusions were incorrect, *see Washington*, 171 F.4th at 491 (denying stay where HUD did not challenge each independent basis), the agency's failure to address pretext should alone doom its request for a stay.

HUD's other efforts to displace the district court's merits determinations also fail. Defendants argue that the court erroneously deemed Plaintiffs likely to succeed before HUD had compiled the administrative record. Mot. at 13–14. As the district court explained, however, it did not need to wait for Defendants to

compile the administrative record before issuing preliminary relief. ECF 49 at 7–8 (discussing authority to enter preliminary relief on incomplete record). Tellingly, HUD did not offer any further explanatory materials in support of either its motion for reconsideration or its request for a stay in the district court. Defendants now concede that "[t]he notices and contemporaneous memorandum are clear about HUD's rationale." Mot. at 14. Taking that statement as true, the materials necessary to evaluate Plaintiffs' request for preliminary relief are already in the record and were considered by the district court. Now, as before, those materials fail to justify HUD's arbitrary and capricious issuance of the FY2025 NOFOs.

## II. The District Court Appropriately Ordered Interim Relief.

Contrary to Defendants' mischaracterization of the orders on appeal, the district court properly ordered preliminary relief tailored to address Plaintiffs' ongoing irreparable harm. "Since the district court is in the best position to tailor the scope of injunctive relief to its factual findings, [appellate] review is for abuse of discretion only." *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 487 (1st Cir. 2009). HUD has not shown that the district court's interim relief rises to the level of an abuse of discretion, nor could it.

The district court provided "interim relief intended to prevent the irreparable consequences of agency action [the Court] had found likely unlawful."

ECF 39 at 5 (September 14 Order). Indeed, without the imposition of *any* deadlines, the district court has required HUD to take interim steps while the litigation is ongoing, such as instructing HUD to "proceed on an expedited basis *toward* obligation," *Id.* at 8 (emphasis added).

Defendants wrongly decry this relief as permanent. Not so. Rather, the district court's interim relief ensures that HUD can swiftly obligate FY2025 funds after the court resolves the merits of Plaintiffs' claims—regardless of which way the court ends up ruling. If Defendants prevail, then HUD can swiftly obligate funds to the "already selected awardees" under the original July 2 FY2025 NOFOs. *See* ECF 45 at 21–22. If Plaintiffs prevail, however, HUD can only quickly obligate funds to alternate awardees if it already has taken steps toward lawful deployment of the FY2025 FHIP appropriation, including the publication of revised NOFOs. The interim relief thus levels the playing field between these two outcomes, while ensuring that FY2025 funds are obligated without delay.

This interim relief is tailored to redress Plaintiffs' ongoing irreparable harm. "Even though preliminary injunctive relief is typically intended to preserve the status quo," a court may order specific relief where the disputed matter "is not a 'condition of rest,' but one 'of action which, if allowed to continue or proceed unchecked and unrestrained, will inflict serious irreparable injury.'" *Francisco*

*Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1, 20–21 (1st Cir. 2009) (quoting *United States v. Price*, 688 F.2d 204, 212 (3d Cir. 1982)). The status quo here is one of action, in which Plaintiffs are suffering irreparable harm due to the funding gaps caused by HUD's arbitrary and capricious administration of FHIP. ECF at 23–24. Mandatory relief is therefore appropriate here because it mitigates that harm. That relief facilitates the effectiveness of eventual permanent injunctive relief by cutting months off the time it would otherwise take for HUD to obligate funds—months that are essential to the continued operations of grantees at risk of closure without FHIP funding.

Absent interim relief, even if Plaintiffs prevail, they will suffer severe and irreparable injury. HUD would be starting at square one and, according to its own projection, take several months to issue new NOFOs, collect applications, select awardees, and obligate funds—all of which would only *start* after final resolution of this case. *See* ECF 40 at ¶¶ 6, 9 (projecting "new NOFOs could be published in one month or two" and funds obligated six months after publication). HUD's own statement of how it intends to operate absent judicial intervention underscores the propriety and necessity of this Court's interim relief.

HUD also wrongly argues that the interim relief is unwarranted because specific relief would not be available at final judgment. Specific relief (aside from

vacatur and remand) is no doubt available in APA cases. *Bolieiro v. Holder*, 731 F.3d 32, 41 (1st Cir. 2013) (recognizing "exception to the ordinary remand rule"); *Guertin v. United States*, 743 F.3d 382, 388 (2d Cir. 2014) ("[T]here are occasions in which remand to the agency for further review is not appropriate."). In the likely event Plaintiffs prevail, the district court will then determine the appropriate remedy, including whether specific relief is warranted. But that question is not at issue in this appeal, and its resolution is premature.

## III. Defendants Will Not Be Irreparably Injured Absent a Stay.

The harms asserted by Defendants are overstated and do not warrant a stay. Absent a stay, Defendants will have to issue new FY2025 NOFOs and process applications while this appeal is pending. If they ultimately prevail, the worst-case scenario is that they will have done duplicative paperwork. Defendants have not shown that this purported harm is especially grave or warrants a stay. And Defendants' complaint that the court's weekly status report requirement causes irreparable harm—while HUD dismisses prospective layoffs and organizational closures as minor—is even more nonsensical.

Furthermore, any short delay in HUD's award of FY2025 funds to already-selected awardees does not cause irreparable harm to HUD or to those putative awardees. Those unknown awardees are not existing FHIP recipients and

have no longstanding reliance interest on immediate receipt of FHIP funding; HUD has provided no reason to think they will suffer irreparable harm from waiting until after this Court hears HUD's appeal to receive awards (should HUD prevail). Furthermore, Defendants assert that the FY2025 NOFOs are "new" and "different" partnerships, *see* Mot. at 15, not ongoing fair housing-related activities. HUD has not shown that a delay in the obligation of funds to a handful of putative grantees will cause it or those grantees *any* harm, much less irreparable harm that justifies the extraordinary remedy of a stay.

The contrast between this case and *Washington v. HUD*, No. 26-1922, 2026 WL 2730937 (1st Cir. Sept. 16, 2026) ("*Washington II*"), demonstrates why HUD is not suffering irreparable harm here. In *Washington II*, this Court held that HUD would suffer irreparable harm from an order enjoining its implementation of homelessness-related NOFOs because HUD "would be unable to implement the NOFO in a timely manner—thereby creating funding gaps—unless a stay enters." *Id.* at *1. The logic of this decision counsels against a stay of the interim relief awarded here. The district court's orders do not create funding gaps; HUD's arbitrary and capricious overhaul of FHIP has created those gaps. The interim relief contained in those orders is tailored to *expedite* rather than *slow down* grant

awards, ensuring that HUD will be able to implement NOFOs in a timely manner, regardless of the outcome of this appeal.

## IV. The Remaining Nken Factors Weigh Against a Stay

A stay will substantially injure Plaintiffs and the public interest weighs against a stay. The district court found that Plaintiffs, including NFHA's members, will suffer irreparable harm absent a preliminary injunction, ECF 28 at 23–24, a finding that is reviewable only for abuse of discretion, *NACM-New England, Inc. v. Nat'l Ass'n of Credit Mgmt., Inc.*, 927 F.3d 1, 5 (1st Cir. 2019). Defendants' argument that Plaintiffs are not entitled to particular grants is beside the point. Plaintiffs have a reasonable expectation that they can compete for FHIP funds, particularly where HUD's consistent administration of FHIP and the statute itself dictates that fair housing organizations are the intended recipients of FHIP funds. 42 U.S.C. § 3616a(b)(1) (only fair housing enforcement organizations eligible for PEI funds). Furthermore, evisceration of the nationwide network of fair housing organizations gravely threatens the public interest.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to stay.

Dated: October 2, 2026

Respectfully submitted,

_s/ Lila Miller_
Lila Miller (Bar No. 1216671)
Reed Colfax (Bar No.1216672)
Nicholas Abbott (Bar No. 1226475)
RELMAN COLFAX PLLC
1225 19th Street NW Suite 600
Washington, DC 20036
Telephone: (202) 728-1888
Facsimile: (202) 728-0848
lmiller@relmanlaw.com
rcolfax@relmanlaw.com
nabbott@relmanlaw.com

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the brief contains 5,069 words. The document complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E), 32(a)(5), and 32(a)(6) because it has been prepared using Microsoft Word in proportionately spaced 14-point Times New Roman typeface.

Dated: October 2, 2026

*s/ Lila Miller*
Lila Miller
*Counsel for Plaintiffs-Appellants*