No. 26-2084

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

MASSACHUSETTS FAIR HOUSING CENTER;
NATIONAL FAIR HOUSING ALLIANCE,

Plaintiffs-Appellees,

v.

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,
SCOTT TURNER, *in his official capacity as Secretary of the Department of Housing and Urban Development*,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Massachusetts

# REPLY IN SUPPORT OF EMERGENCY MOTION FOR STAY PENDING APPEAL

BRETT A. SHUMATE
*Assistant Attorney General*

DANIEL TENNY
SARAH CLARK GRIFFIN
*Attorneys, Appellate Staff*
*Civil Division, Room 7216*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-8727*

# TABLE OF CONTENTS


**Page**

TABLE OF CONTENTS

INTRODUCTION ........ 1

ARGUMENT ........ 2

I. The government is likely to prevail on its appeal ........ 2

II. The equitable factors favor a stay pending appeal. ........ 8

CONCLUSION ........ 11

CERTIFICATE OF COMPLIANCE

## INTRODUCTION

Unable to defend the district court's order, plaintiffs rewrite it. The district court issued a so-called temporary restraining order compelling HUD to obligate funds using the "FY2024 structure" by the end of fiscal year 2026, and then declined to reconsider that order (other than delaying the deadline) after the funds were extended for a year. But plaintiffs now suggest that the orders do not require HUD to obligate the 2025 funds at all. That is plainly mistaken.

In any event, even plaintiff's rewritten order is indefensible. Even if the district court is not thought to have required HUD to actually dispense funds, the district court had no basis, in the posture of a temporary restraining order, to vacate HUD's notices of funding opportunity, much less to require HUD to undergo a different grant process according to the preferences of plaintiffs and the district court. And that is all the more apparent because the alleged flaws in HUD's approach merely reflect policy judgments that are well within HUD's authority and were amply explained. Plaintiffs seek to bind HUD to the formulaic and repetitive awards of years past. But plaintiffs have no entitlement to an unending funding stream (and in any event continue to have access to substantial Program funds). And Congress has entrusted HUD—not plaintiffs or the district court—to exercise its judgment and expertise in structuring its fair housing activities. A stay is warranted.

## ARGUMENT

### I. The government is likely to prevail on its appeal.

**A.** The relief ordered exceeds the district court's authority. The orders grant plaintiffs complete relief on the merits by vacating the notices of funding opportunity and *sua sponte* directing HUD to a use previous year's funding structure, overlaid with additional, court-imposed requirements, to disburse the 2025 funds. Such relief goes beyond temporarily preserving the status quo and exceeds the permissible scope of a temporary injunction, especially where, as here, the court has only concluded that plaintiffs are likely to succeed on the merits. Moreover, even if the district court was correct in permanently vacating the 2025 notices at this preliminary stage, the court had "no jurisdiction to order specific relief"—the imposition of the 2024 funding structure—and to substitute its judgment for HUD's. *See Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005).

Plaintiffs' only response is to state that the district court's relief is "interim." Opp. 18-21. On appeal, plaintiffs suggest that the district court has merely ordered HUD to identify "alternate awardees," so that HUD can obligate funds to those awardees at the end of the litigation if plaintiffs ultimately prevail. Opp. 19; *see also* Opp. 3-4. Even if plaintiffs were correct that the orders did not require HUD to actually obligate the funds but simply to abandon its preferred competition, issue new notices, review new applications, and select new awardees, the orders would still exceed the court's

authority. But the orders do require HUD to obligate funds, as plaintiffs have insisted in district court filings.

The court ordered HUD "to adopt [its] FY2024 structure in allocating the FY2025 funds" so that HUD could obligate the funds before they expired on September 30, 2026. Add. 26. Plaintiffs' motion to enforce the temporary restraining order embraced this interpretation. *See* ECF 31, at 2 (seeking to ensure that the funds are "obligated as required by Congress and the August 26 Order"); *id.* (arguing that HUD must "swiftly comply with the August 26 Order and lawfully obligate FY2025 FHIP funds"); *id.* at 3 (asking the court to order HUD to "obligate all FY2025 FHIP funds" by September 30 and "execute all requisite contracts and agreements related to the obligation of FY2025 FHIP funds" by October 30). And even when Congress extended the funds' expiration by a year, plaintiffs vigorously resisted any delay in the funds' obligation. *See* ECF 35, at 12 ("Should this Court nonetheless conclude it must modify the August 26 Order to allow HUD additional time to obligate the FY2025 funds in a manner consistent with the Order, it should direct Defendants to obligate funds using the FY2024 structure on an expedited timeline.").

In denying reconsideration and largely granting plaintiffs' motion to enforce, the district court did not modify the requirement to obligate funds. *See* Add. 33 (conceding only that, "[t]o the extent a statute requires congressional notification or another mandatory step before a particular award or obligation may lawfully occur, HUD must comply with that requirement"); *id.* (faulting defendants for not identifying "a date by

which they commit to . . . making the awards"); Add. 35 (directing HUD to address, in its weekly agency declarations, "anticipated dates for . . . obligation[] and execution of grant agreements"). Indeed, the court reiterated that the purpose of the relief was to "provide . . . organizations the funding they need now." Add. 29. That is not consistent with the idea that the district court was simply directing HUD to prepare itself to make awards at the end of the litigation.

Even if the court could or did direct HUD to prepare to make awards at the end of the litigation, plaintiffs provide no justification for the court's decision to choose the structure for those awards instead of leaving it to HUD's discretion. Plaintiffs wave this question away as "premature," suggesting that, if they prevail, "the district court will then determine the appropriate remedy, including whether specific relief is warranted." Opp. 21. This is backwards. The district court has already ordered extreme and unwarranted specific relief. It is certainly no defense that the district court might order additional relief at final judgment, nor does that prospect mitigate the need for a stay pending appeal.

Plaintiffs point to this Court's recognition that, in some instances, a court can instruct an agency to reach a particular result, but the case on which they rely only highlights the error of the district court's action here. In *Bolieiro v. Holder*, 731 F.3d 32 (1st Cir. 2013), this Court rejected reliance on "the 'rare circumstances' exception to the ordinary remand rule," reasoning that the government could not show "that the outcome of [the] proceedings [was] foregone." *Id.* at 41. This case does not fall within

that exception, as there is no plausible argument that HUD is compelled to carry out an open-ended federal grant program in the particular manner the district court has ordered, such that there would be no other option available to HUD on remand. Even plaintiffs do not argue otherwise, merely promising to address the issue later if they ultimately prevail on the merits. *See* Opp. 21. That is manifestly inadequate to justify the extraordinary relief that has already been issued by the district court.

**B.** As explained, the remedial problems are sufficient to grant a stay, but the district court was also wrong on the merits.

HUD's allocation of its 2025 lump-sum appropriation for "fair housing activities" is not reviewable. The lump-sum appropriation did not require HUD to allocate any funds to the Program as opposed to other fair-housing activities that HUD funds, much less to make the more granular allocations that plaintiffs have demanded here. Plaintiffs' assertion that Congress has provided "standards that constrain HUD's use of [Program] funding" (Opp. 12-13) is therefore unresponsive. And neither 42 U.S.C. § 3616a (on which plaintiffs rely), nor the prefatory, non-binding legislative finding (on which the district court relied, Add. 15), nor the non-binding 2024 appropriations guidance (on which the Senator amici rely, Amicus Br. 7-10) provide a meaningful legal standard by which to judge the challenged allocations.

Moreover, the district court erred in vacating the notices before HUD had presented its administrative record. In defense, plaintiffs state only that the court did not need to wait for the record to issue preliminary relief. Opp. 17-18. But, as explained,

the relief here is not preliminary. *See supra* pp. 2-3. And it would be odd indeed if the district court could vacate agency action on the grounds that it was arbitrary and capricious before reviewing the basis for the agency action in question. At most, the district court could have prohibited HUD, on a temporary basis, from making final awards based on the challenged criteria.

Even that relief would have been entirely unwarranted, however, because the notices are not arbitrary and capricious. The notices and contemporaneous memorandum explain the changes to the Program, without pretext, and expressly account for reliance interests.

Plaintiffs argue that HUD was required to do more "to *explain* the new 'blended' structure." Opp. 15. It is not clear what is left to explain. HUD sought to distribute the 2025 and 2026 funds across all four Initiatives. Instead of having four competitions for 2025 funds and four competitions for 2026 funds, HUD decided to have four total competitions—one for each initiative. It is self-evident from the notices that HUD planned to distribute the 2025 and 2026 funds as part of one coordinated endeavor. And the notices and memorandum explained HUD's reasoning for making various changes to the competitions. That reasoning is not inadequate—plaintiffs simply disagree with it. *See, e.g.*, Opp. 15 (complaining that HUD's approach could not be justified by concerns of waste, because the new approach would "waste" past awards by causing past awardees to limit their activities going forward). The district court's conclusion that HUD's reasons were pretextual is another version of the same argument

and fails for the same reasons. Plaintiffs assert that HUD cannot be sincere in its desire to "expand geographic coverage[,] . . . broaden and invest in future expertise, increase innovation, and strengthen the long-term resilience of the national fair housing infrastructure," because the Fair Housing Organizations notice envisioned five large awards to organizations for projects with a more national scope, rather than smaller awards to "organizations scattered throughout the country." Opp. 17. This again is a simple difference of opinion, not a failure of reasoned decisionmaking. It also ignores the fact that HUD also offered funds to state and local entities around the country through the Administrative Enforcement notice.

Plaintiffs insist, as the district court did, that "there is no indication" that HUD acknowledged or considered their reliance interests. Opp. 16. That is irreconcilable with HUD's memorandum, which explained that HUD had considered the risk of "negative impact[s] on existing recipients," but that the potential impact was mitigated by the fact that most grantees operated under multi-year awards with one to two years of remaining funding and was ultimately "outweighed by the other policy priorities." Add. 59. HUD was not required to go grantee-by-grantee in analyzing reliance interests, nor was it required to weigh those interests as heavily as plaintiffs would. And plaintiffs do not dispute that they have no entitlement to future funding.[1]

---

[1] Plaintiffs misleadingly assert that HUD has "eliminate[d]" and "zero[ed] out" Private Enforcement and Education and Outreach awards. Opp. 14-15; *see also* Amicus Br. 2, 6-9 & n.5. Not so. HUD issued notices for new awards under both of those

*Continued on next page.*

## II. The equitable factors favor a stay pending appeal.

The harm to HUD and the public outweighs any harm to plaintiffs from a stay.

A stay will not substantially harm plaintiffs. Plaintiffs have no entitlement to any particular grant and no statutory right to continued funding. Acknowledging as much, plaintiffs fall back on the argument that they will be harmed absent a stay because they "have a reasonable expectation that they can compete for [Program] funds." Opp. 23. But plaintiffs are no more entitled to a competition in which they are likely to prevail, or to receive a certain level of funding, than they are to a particular grant. In short, plaintiffs' alleged harms to their ability to compete and, by extension to their bottom lines and operations, are the routine consequence of participating in competitive federal grant programs that vary annually in scope, priorities, and eligibility. In any event, plaintiffs can still compete for Program funds. Plaintiffs could have participated in the Fair Housing Organizations Initiative competition by partnering with another organization or, for plaintiffs' members who are large enough, competing on their own. Moreover, eligible organizations can also compete for other initiatives, including the ongoing fiscal year 2026 Private Enforcement Initiative and Education and Outreach Initiative competitions. And HUD continues to negotiate the multi-year Private Enforcement Initiative renewals.

initiatives on the same day it issued the 2025 notices. Those awards will simply come from the 2026 funding bucket instead of the 2025 funding bucket. In addition to these new awards, HUD is actively renewing multi-year Private Enforcement Initiative grants.

Meanwhile, HUD will be irreparably injured absent a stay. The orders force the agency to abandon a nationwide competition that is well underway and reconfigure it in a manner contrary to HUD's judgment and expertise and not even plausibly required by statute, all on a needlessly expedited basis and accompanied by active court supervision. *See* Mot. 16-17. This in turn diverts agency resources from other program responsibilities. Mot. 18. (Indeed, as HUD's status reports make clear, the requirement to adopt the 2024 structure—imposed in an effort to rush the process along—has only made things more complicated, underscoring the risks of sidelining agency expertise in favor of judicial micromanagement.)

Plaintiffs attempt to characterize all this as a concern about potentially "duplicative paperwork," Opp. 21, but the injuries are far more weighty. Indeed, plaintiffs have no response at all to the argument that the decision irreparably harms HUD by preventing it from implementing its congressional mandate to set housing policies and priorities. As explained, any time the government is prevented "from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) (quotation marks omitted). HUD has exercised its judgment in determining how best to allocate its appropriated funds for fair housing activities and the terms on which it offers funding for the Program. Thwarting HUD's exercise of its judgment irreparably injures HUD and the public interest. Nor do plaintiffs have any response to the point that the orders

perpetuate the gaps in service that HUD was trying to remedy with the Administrative Enforcement Initiative notice. *See* Mot. 19.

Plaintiffs downplay the injury to the awardees (and those served by their grant work) who had already been selected under the 2025 notices, suggesting that they would not be harmed by a "short delay" in receiving their awards. Opp. 21. But it strains credulity to think that already-selected awardees are not harmed by having to wait until the end of the appeal or the litigation to receive the $5 to $25 million in awards that they expected to have received already. The Court recognized as much in granting a stay in *Washington v. HUD*, No. 26-1922, 2026 WL 2730937 (1st Cir. Sept. 16, 2026). There, the Court stayed a district court's vacatur of HUD's 2026 notice of funding opportunity for homelessness-services funds, recognizing that the district court's decision would delay HUD from implementing its 2026 notice and therefore cause funding gaps. *Id.* at *1. So too here, where the orders delay HUD from implementing its 2025 notices. The idea that the district court's orders serve the goal of getting funds out in a timely manner (Opp. 23) cannot be squared with the fact that they require HUD to reconfigure its 2025 awards process from the ground up, on the district court's terms, rather than finalizing the awards that were effectively ready to go out the door.

## CONCLUSION

For the foregoing reasons, the Court should grant a stay pending appeal.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

DANIEL TENNY

*s/ Sarah Clark Griffin*
SARAH CLARK GRIFFIN
*Attorneys, Appellate Staff*
*Civil Division, Room 7216*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-8727*
*sarah.c.griffin@usdoj.gov*

OCTOBER 2026

**CERTIFICATE OF COMPLIANCE**

This reply complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 2,588 words. This reply also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Sarah Clark Griffin*
Sarah Clark Griffin